UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| RICHARD LEE MULLENHOUR,<br><br>Estate Plaintiff,<br><br>v.<br><br>PENN CENTRAL CORPORATION, et al.,<br><br>Defendants. | Case No. 3:22-CV-32-CCB |

**OPINION AND ORDER**

In anticipation of trial, Defendants have moved to exclude the testimony of Plaintiff's expert Dr. Mark Levin. (ECF 139). Plaintiff has made a reciprocal motion to exclude the testimony of Defendants' expert Dr. Peter G. Shields. (ECF 141). The Court now rules on both motions.

## STANDARD

Expert testimony is admissible at trial under Federal Rule of Evidence 702 if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and results from reliable scientific or other expert methods that are properly applied. *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93 (1993). Before admitting expert testimony, courts "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will assist the trier of fact to understand the evidence or to determine a fact in issue." *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017) (internal quotations omitted). As

the 2023 Amendment to Rule 702 clarified, courts have an independent gatekeeping duty to ensure the reliability of experts by a preponderance of the evidence. Fed. R. Evid. 702 advisory committee's note to 2023 amendment, n.1.[1] In making this determination, courts often look to factors such as whether a theory has been subjected to peer review or accepted within the relevant expert community, whether there are standards controlling the technique's operation, and whether it has a potential error rate. *See Deputy v. Lehman Bros.*, 345 F.3d 494, 505 (7th Cir. 2003). Still, "No one factor is dispositive . . . and 'the Supreme Court has repeatedly emphasized [that] the Rule 702 test is a flexible one.' " *Timm v. Goodyear Dunlop Tires N. Am., Ltd.*, 932 F.3d 986, 993 (7th Cir. 2019) (alteration in original) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 719 (7th Cir. 2000)). In addition, "the correct inquiry focuses not on 'the ultimate correctness of the expert's conclusions,' but rather on 'the soundness and care with which the expert arrived at her opinion.'" *Id.* (quoting *Schultz v. Akzo Nobel Paints, LLC*, 721 F.3d 426, 431 (7th Cir. 2013)). An expert's opinion "must consist of more than simply 'subjective belief or unsupported speculation.'" *Cummins v. Lyle Indus.*, 93 F.3d 362, 368 (7th Cir. 1996) (citing *Daubert*, 509 U.S. at 589). The burden to establish the admissibility of an expert's

[1] Thus, any caselaw before or after the 2023 amendment holding that expert reliability is a question of weight for the jury would be invalid. *See Delaware v. Pennsylvania*, 598 U.S. 115, 120 (2023) (changes in the relevant law can abrogate precedent); *United States v. Mitan*, 966 F.2d 1165, 1170 (7th Cir. 1992) ("The rules of evidence are not advisory—they are obligatory"). At the same time, the amendments to Rule 702 were clear that they did not change the Rule's meaning, but merely clarified its application. *See* Fed. R. Evid. 702 2023 comments, at n. 2 ("Nothing in the amendment imposes any new, specific procedures"). Any circuit caselaw that properly interpreted and applied Rule 702 prior to the 2023 amendment would be as equally binding on this Court after the amendment as before it. *See In re Abbott Lab'ys, et al., Preterm Infant Nutrition Prods. Liab. Litig.*, No. 22 C 00071, 2025 WL 2987083, at *4 (N.D. Ill. Oct. 23, 2025)

testimony by a preponderance of the evidence falls on its proponent. *Varlen Corp. v. Liberty Mut. Ins.*, 924 F.3d 456, 459 (7th Cir. 2019).

Under Rule 702, an expert may be qualified to testify by "knowledge, skill, experience, training, or education." *Higgins v. Koch Dev. Corp.*, 997 F. Supp. 2d 924, 930 (S.D. Ind. 2014) (quoting Fed. R. Evid. 702). An expert is qualified if his "qualifications provide a foundation for [him] to answer a specific question." *Id.* (quoting *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994)). In other words, courts determine whether an expert is qualified by evaluating each of the expert's conclusions individually, then assessing whether the expert has the "adequate education, skill, and training to reach them." *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010). An expert's specialization, or lack thereof, "typically goes to the weight to be placed on [her] opinion, not its admissibility." *Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016).

In toxic torts cases like the one here, plaintiffs usually must provide testimony on both "general causation" and "specific causation." General causation establishes the ability of a substance to cause or contribute to a disease under certain conditions, while specific causation establishes that a plaintiff's actual exposure did in fact contribute to a disease. *See Hammer v. Residential Credit Sols., Inc.*, No. 13 C 6397, 2015 WL 7776807, at *37 (N.D. Ill. Dec. 3, 2015) (citing *Myers v. Illinois Cent. R. Co.*, 629 F.3d 639, 641–42 (7th Cir. 2010)).

## ANALYSIS

A. **Defendants' Motion to Exclude**

Plaintiff brings Dr. Levin to testify on both general and specific causation with regard to welding fume exposure. *See supra* page 3. Defendants have moved to exclude Dr. Levin, arguing that his methodology is flawed. First, Defendants argue that Dr. Levin's process for researching and arriving at his general causation opinion on welding fume exposure was not reliable. Second, they object to a portion of Dr. Levin's testimony on specific causation, arguing that he had no basis to claim that exposure to any welding fume levels "above background" could have contributed to Plaintiff's cancer. Third, they object to the entirety of Dr. Levin's specific causation opinion on the basis that he used an unreliable source for his facts and data.

**1. General Causation Opinion**

Dr. Levin's general causation opinion heavily relies on work by the International Agency of Research on Cancer ("IARC"), which found that certain levels of exposures to welding fumes could increase the risk of lung cancer. (ECF 148-1 at 12–14). Defendants do not object to any aspect or finding of this study or any of Plaintiff's other sources. Rather, they cite language from his deposition where he stated that his search process for articles that formed the basis of his opinion took "perhaps an hour or so." (ECF 139-4 at 47). Defendants attempt to frame this as a critical flaw in Dr. Levin's methodology. That argument fails.

First, Defendants do not cite a single case suggesting that there is an abstract minimum threshold of time that an expert must spend developing his methodological framework. Nor is there one; the time an expert puts into the preparation of a report could vary widely between cases and depends on a variety of factors. *See Leibfried v.*

*Caterpillar, Inc.*, 701 F. Supp. 3d 774, 779 (E.D. Wis. 2023) ("Because there are many different kinds of experts and expertise, the test for reliability is flexible, and no one factor is dispositive.") (citing *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 873 (7th Cir. 2021); *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 780 (7th Cir. 2017)). That is why the standard for admissibility focuses on the *substance* of the report and testimony rather than arbitrary procedural factors such as how much time went into its preparation. *See United States v. Mamah,* 332 F.3d 475, 478 (7th Cir. 2003) (emphasizing that there must be "a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support"). The cases cited by Defendants only go to reinforce this point. *See, e.g.*, *Claar v. Burlington N. R. Co.*, 29 F.3d 499, 502 (9th Cir. 1994) ("In order to qualify as 'scientific knowledge' [as required by Rule 702], an inference must be derived by the scientific method") (alterations in original) (internal quotations omitted); *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir. 1994) ("A district judge should assure himself, before admitting expert testimony, that the expert knows whereof he speaks").

Indeed, this exact case shows why there is *not* such a standard. First, Dr. Levin stated that there were a number of "articles I'm aware of, I know of because of previous cases" prior to beginning his search. (ECF 139-4 at 66). Thus, Dr. Levin's search did not start from scratch, but was informed by previous work. Second, Dr. Levin's description of what took him "an hour or so" was not his reading of the literature, or his preparation of the report. Rather, it was the time to *find* relevant articles. (*Id.* at 46–47) (providing the "hour or so" time estimate in response to the question of "how it was

that you found these articles" that the report was based on). Dr. Levin testified that the full process of generating his report took approximately a week. (*Id.*). Defendants' focus on Dr. Levin's testimony asks the wrong question (how much time Dr. Levin put into the report is not dispositive under Rule 702) and gives the wrong answer (the total time was far more than an "hour or so.").

Ultimately, Defendants' argument confuses a secondary literature research process for a methodology. For example, Defendants argue that Dr. Levin did not provide a methodology for his "literature search." But the relevant methodology in this case is not a "literature search"—it is the actual analytical substance of Dr. Levin's opinions. Plaintiff provides ample citations for and explanation of the basis for Dr. Levin's opinions. Nor do Defendants even attempt to directly attack that substance.[2] Exclusion of Dr. Levin's opinion on this basis is not warranted.

**2. "Any Level Above Background."**

Next, Defendants argue that there is no methodological basis for Dr. Levin's assertion that any exposure to welding fumes "above background levels" would be sufficient to create a causal connection to Decedent's cancer.

Here, Defendants' motion stands on firmer ground. Defendants note that in his deposition and report, Dr. Levin did not cite a single source or study claiming that any fume exposure above background would increase the likelihood of cancer. In fact,

[2] Defendants also cite Dr. Levin's testimony that he could not remember whether he had found any articles showing no increase in lung cancer due to welding fume exposure. (ECF 140 at 12). But again, this fails to call the substance of his testimony into question. It is quite true that if there was evidence that Dr. Levin cited faulty research, or failed to recognize or address relevant existing research contradicting his own testimony, that could be problematic under Rule 702. But Defendants do not argue this.

Plaintiff does not even try to defend this proposition but instead reframes Dr. Levin's statements, arguing that "[i]n the proper context, Dr. Levin is not announcing that his causation threshold is 'any exposure above background." (ECF 148 at 18). Plaintiff argues that the primary basis for Dr. Levin's report was the specific exposure numbers measured by Dr. Rosenfeld, which "exceed regulatory thresholds and can be compared to IARC, particularly its findings that increased risk [is] found below 1 mg/$m^3$ over a working lifetime." (ECF 148 at 18). Plaintiff argues that Dr. Levin was merely articulating a minimum "necessary but not sufficient" *floor* for causation, rather than an amount *sufficient* to create causation. (*Id.* at 17–18).

That interpretation is hard to square with the record. Dr. Levin's initial statements regarding "the minimum . . . above background level," (in the context of diesel fumes) were given in response to a question about what level of exhaust exposure "can cause lung cancer." (ECF 139-4 at 65–66). Later, in response to a question about "what level of exposure to welding fumes is necessary for you to opine there's an increased risk of lung cancer," he stated that the answer would be "the same . . . as before, the minimum above background levels" (*Id.* at 71). This testimony is at best ambiguous, and it is at least plausible to interpret Dr. Levin as stating that he would be comfortable affirming specific causation if there was a measurement of any exposure above background levels. Nor does his reliance on Dr. Rosenfeld's estimates moot this question. If Dr. Levin was willing to testify that "any level above background" could increase risk of cancer, Plaintiff would no longer need to rely on Dr. Rosenfeld's estimates to support Dr. Levin's conclusion. Or at the very least, Plaintiff could use Dr.

Levin's statements as a backup if the jury had reason to question Dr. Rosenfeld's report. Plaintiff actually suggests this. (ECF 148 at 17–18) ("Defendants' selected quotations . . . are simply statements about Dr. Levin's floor . . . *or if Dr. Rosenfeld's numbers are wrong*." (emphasis added)).

Thus, assuming that Dr. Levin's statements can be read as affirming that there is a causal connection between cancer and exposure to welding fumes at any level "above background," the Court finds that these statements are insufficiently supported by Dr. Levin's methodology and data under Rule 702. Dr. Levin is precluded from testifying to that effect.

**3. Entirety of Dr. Levin's Specific Causation Opinion**

In the response brief to Defendants' motion, Plaintiff argued that Dr. Levin's opinion on specific causation is primarily supported by his Rule 703 reliance on Dr. Rosenfeld's report, which concluded that "to a reasonable degree of scientific certainty, that Mr. Mullenhour's welding-fume exposures were well above" the permissible limits. (ECF 148 at 9). Even though Dr. Levin can rely on another expert's data or analysis under Rule 703, that data must still be "reliable" for Dr. Levin's own expert opinion to be admissible under Rule 702. *See Nachtsheim v. Beech Aircraft Corp.*, 847 F.2d 1261, 1270 (7th Cir. 1988). Defendants' reply spends considerable time attacking the reliability of Dr. Rosenfeld's data. (ECF 149 at 4–8).

Defendants argue that Dr. Rosenfeld's opinion is not reliable because he "conceded that his welding fume exposures estimates as to Decedent were based upon work Decedent never performed." (EF 149 at 6). But that misrepresents Dr. Rosenfeld's

testimony. He indeed acknowledged that "most of the studies" he used were conducted in shops, even though the data was not always clear on that point because "everything is associated with a shop but sometimes the shops are outdoors." (ECF 149-2 at 44–45). However, he emphasized that this data was the best available, noting that "very few studies, if any" were conducted outside. (ECF 149-3 at 56). This does not show that Dr. Rosenfeld's methodology was unreliable, but only that he did the best work available with the data on hand. *See United States v. Mikos*, 539 F.3d 706, 711 (7th Cir. 2008) ("an expert need not rely on 'a complete and flaw-free set of data' to form an admissible opinion"). Dr. Rosenfeld also explained why even indoor samples would be relevant for Mr. Mullenhour, describing how "we know that sometimes Mr. Mullenhour was put in positions where he might have been under a railcar or on the side of a railcar or . . . potentially inside a railcar where the wind would die down and he had the potential to be exposed to levels that are similar to those from the shop data." (ECF 149-3 at 57).

Defendants also argue that Dr. Rosenfeld "admitted" that "actual testing of Decedent showed that welding fumes exposures were not above PELs [Permissible Exposure Limits]."(ECF 149 at 6). However, Dr. Rosenfeld specifically addressed this discrepancy in his testimony, criticizing the relative accuracy and sufficiency of the "one or two selected incidents" which indicated that Mr. Mullenhour "was not exposed at levels that exceeded a PEL." (ECF 149-3 at 57). Dr. Rosenfeld emphasized that these were merely "snapshots" from "[Decedent's] 38-year career" in which "it's more likely than not that he was in certain situations" that would cause "high levels of exposure to welding fumes." (*Id.*). Dr. Rosenfeld even explained that there might have been

incentive-based reasons for lack of monitoring inside railcars because industrial hygienists decided not to test based on the possibility of recording a PEL exceedance. (139-3 at 63). Therefore, Dr. Rosenfeld sufficiently explains the basis for his methodology and the grounds for its reliability, specifically responding to Defendants' objections. Dr. Rosenfeld's report is reliable, and there is no independent basis to strike Dr. Levin's opinion for relying on it.

**B. Plaintiff's Motion to Exclude**

Plaintiff has moved to exclude the testimony of Defendants' expert Dr. Peter G. Shields, M.D. (141). First, Plaintiff argues that Dr. Shields is not qualified to assess Mr. Mullenhour's diesel exhaust or welding fume exposure. Second, Plaintiff argues that Dr. Shields' methodology is unreliable because "Dr. Shields does not state that he measured, calculated, or reconstructed Mr. Mullenhour's individual [exposures]." (ECF 142 at 7).

**1. Qualifications**

Plaintiff argues that Dr. Shields is not qualified to testify because he "has no formal industrial hygiene training" and "is not a certified industrial hygienist." This argument confuses the relevant field of expertise. Industrial hygiene is the study of identifying best methods for measuring and quantifying exposure levels in the workplace. (ECF 147-4 at 2–3). For example, both Defendants' industrial hygienist expert Dr. Grogan and Plaintiff's expert Dr. Rosenfeld have done extensive work in modeling precise quantifications and measurements of exposure levels for various groups at various industrial locations. (ECF 147-3 at 2–4; 148-7 at 5–7). Dr. Shields, on

the other hand, does not purport to have engaged in on-site quantitative testing, but instead relies on analysis already in the record. His work explores the effect of specific exposure levels on carcinogenic risk. (ECF 147 at 4–6).

Furthermore, Plaintiff ignores the reality that fields of expertise can have significant overlap. *See, e.g.*, *Sater v. Republic Servs. of Indiana Transp. LLC*, No. 3:23-CV-403-CCB, 2025 WL 3513821, at *2 (N.D. Ind. Dec. 8, 2025) ("[W]hen deciding the scope of qualification for medical experts, courts have consistently emphasized that the relevant question is not whether the expert's resume, titles, or listed practice area 'fits' the subject matter . . . . Rather, courts look at 'each of the conclusions [a medical expert] draws individually to see if he has the adequate education, skill, and training to reach them." (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)). For example, experts in industrial hygiene provide consultation advice to companies looking to improve and monitor the safety of work environments. *See supra* pages 10–12. Experts in oncology and epidemiology, on the other hand, study how specific types of exposures can lead to cancer and other diseases. (ECF 147-1 at 3–4). These are not completely isolated fields of work. Both, for example, concern the relationship between exposure and disease—just applied to a different purpose. Plaintiff may be correct that portions of Dr. Shields' analysis also fall within the field of industrial hygiene. But there may often be overlap between separate fields of expertise. It is not enough to merely point to a separate field that also covers the relevant subject matter and argue that an opposing expert is not certified in that field. *See Sater*, 2025 WL at *2. Defendants provide substantial evidence

that Dr. Shields is qualified to perform an assessment of cancer risk, and Plaintiff fails to rebut this by attacking his "industrial hygiene qualifications."

**2. Methodology**

Plaintiff argues that Dr. Shields used no case-specific information, and instead calculated Mr. Mullenhour's exposure and risk based on his general abstract conception of what would be "typical" for a railroad worker. If Plaintiff's portrayal of Dr. Shields' methodology was correct, this would certainly call it into question. The law is clear that any expert testifying on specific causation must integrate sufficient facts to connect the circumstances of the specific individual with the general literature. Yet Dr. Shields' reports make clear that he tailored his analysis to Mr. Mullenhour's specific circumstances. *See, e.g.*, (ECF 147-1 at 6-14, 38-42, 48–49). Dr. Shields' reports show that he reviewed testimony from Mr. Mullenhour, multiple co-worker witness testimony records, Mr. Mullenhour's medical records, Plaintiff's expert witness reports, and the report of Defendants' expert, Dr. Rosenfeld. (ECF 147-1; 147-2; 151-2).[3]

Nor did Dr. Shields perform a mere cursory acknowledgment of these records. Rather, he integrated a detailed analysis of Mr. Mullenhour's specific work environment into his report. *See, e.g.*, (ECF 147-1 at 13) ("He testified he would weld, but also operate a diesel-powered forklift, and change brake shoes. About 25% of the time he would weld as part of his repairs using wear plates, as needed daily; the

[3] Plaintiff argues that Dr. Shields could not have reviewed the testimony of Mr. Mullenhour's co-worker witnesses because they were deposed in 2024 and 2025, after Dr. Shields' initial August 2023 report. (ECF 150 at 3). But as Defendants note in their sur-reply, Dr. Shields addressed this new testimony in a supplemental September 15, 2025, report. (ECF 151-1; 151-2).

process for the repair including welding was about 20 minutes."); (*Id.*) ("At deposition, Mr. Monroe asked Mr. Mullenhour for clarifications for frequency of welding and exposures, and Mr. Mullenhour replied about a quarter of time for many things and half the time for others; it not clear how this actually broke down as the quart and half times added to more than 100% and it was not specified for site.").

Plaintiff cites Dr. Shields' statement that Mr. Mullenhour "was a carman who welded," claiming that his entire analysis was based on this conclusory and generalized description of Mr. Mullenhour's specific experiences and work. But that isolated quotation does not convey the full extent of Dr. Shields' discussion. Later on in the same paragraph, Dr. Shields goes into much more specific detail. *See* (ECF 147-2) ("The type of welding Mr. Mullenhour [did] was only stick welding, with is a type of arc welding called manual metal arc (MMA) welding using an electric arc. The range of exposure can be great, for example the IARC monograph indicates that there could be a 50-fold variation with MMA, and also depends on the metal being welded."); *see also* (*Id.* at 27) ("Welding may be a cause of lung cancer in regular welders. Mr. Mullenhour would not be classified as a regular welder in those studies that quantitate risk. His work involved welding only part of his days, according to his testimony. Drs. Rosenthal and Levin claim causation. However, there is no evidence that Mr. Mullenhour ever exceeded some PEL, and did not consider his work environment in open-air shops, type of welding and ventilation.").

Plaintiff also cites to deposition testimony from an earlier case, where Dr. Shields stated that he had never performed an academic study that "focus[ed] on an individual

only." (ECF 142 at 2). Dr. Shields responded that it would be "nonsensical" to do this, because "that's not epidemiology . . . . [t]hat's the definition of a case report" with "no scientific method." (ECF 147 at 15). Plaintiff argues that this testimony shows Dr. Shields has never performed a particularized assessment of an individual. But Dr. Shields' testimony in that case makes clear he was discussing his academic work rather than his approach to providing expert testimony in a specific case. *See* (ECF 147 at 15) (responding to the question "do you have any *publications* where you are . . . assessing the exposures of an individual") (emphasis added). This testimony does not rebut Dr. Shields' showing that his methodology is reliable.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Plaintiff's motion to exclude the testimony of Dr. Shields (ECF 141). The Court **GRANTS** (in part) Defendants' motion to exclude the testimony of Dr. Levin (ECF 139). Dr. Levin is prohibited from testifying that any substance exposure levels "above baseline" could have causally contributed to Decedent's cancer. The Court **DENIES** Defendants' motion as to Dr. Levin's general causation opinion and the remainder of Dr. Levin's specific causation opinion. (ECF 139). As a result of this order, Defendants' motion for a hearing (ECF 144) is **MOOT**.

SO ORDERED on September 11, 2026.

*/s/ Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT